Mamush AFETA, Petitioner,

v.

Alberto R. GONZALES, Attorney General of the United States, Respondent.

No. 05–1174.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 29, 2005.

Decided Oct. 26, 2006.

**ARGUED:** David Goren, Silver Spring, Maryland, for Petitioner. Michelle Gorden Latour, Senior Litigation, United States Department of Justice, Office of Immigration Litigation, Civil Division, Washington, D.C., for Respondent. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Civil Division, M. Jocelyn Lopez Wright, Assistant Director, United

States Department of Justice, Office of Immigration Litigation, Civil Division, Washington, D.C., for Respondent.

Before WIDENER and SHEDD, Circuit Judges, and WALTER D. KELLEY, JR., United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge KELLEY wrote the opinion. Judge SHEDD wrote a concurring opinion. Judge WIDENER wrote a dissenting opinion.

## OPINION

KELLEY, District Judge.

Resident aliens who commit aggravated felonies typically are removed from the United States. 8 U.S.C. § 1227(a)(iii)("Any alien who is convicted of an aggravated felony at any time after admission is deportable."). Petitioner Mamush Afeta ("Afeta") is an Ethiopian national whose most recent convictions were for two counts of felony theft, two counts of attempted car theft, and two counts of destruction of property. He seeks to evade the natural consequence of his crimes (deportation) by claiming that he automatically became a citizen as a minor when his mother was naturalized. *See* 8 U.S.C. § 1432(a)(3) (1999) (repealed 2000). Finding no error in the Board of Immigration Appeals' ("BIA") interpretation of the relevant statute, we deny the petition.

### I.

In 1987, the United States admitted petitioner Afeta (10 years old at the time) and his parents into this country as refugees. His parents ceased living together in December 1987, and petitioner Afeta's father returned to Ethiopia soon thereafter. Petitioner Afeta's mother became a naturalized United States Citizen in 1994. Petitioner Afeta was 17 years old at the time.

In 1997, the Circuit Court of Montgomery County, Maryland convicted petitioner Afeta of auto theft, possession of marijuana, and unauthorized use of a motor vehicle. Two years later, in August 1999, the Circuit Court of Montgomery County, Maryland convicted petitioner Afeta of two counts of felony theft, two counts of attempted auto theft, and two counts of destruction of property. He was sentenced to ten years in prison (with five years suspended).

In 2000, the United States Immigration and Naturalization Service[1] ("INS") ordered petitioner Afeta removed from the United States. As grounds for removal, the INS relied on 8 U.S.C. § 1227(a)(2)(A)(iii) (alien convicted of an aggravated felony) and 8 U.S.C. § 1227(a)(2)(A)(ii) (alien convicted of two crimes involving moral turpitude).

Petitioner Afeta appealed his removal to the Board of Immigration Appeals ("BIA"), asserting that he became a United States citizen by operation of law when his mother was naturalized in 1994. The BIA disagreed and denied his appeal by Order dated January 24, 2005. This Petition followed.

### II.

This Court may conduct only a limited review of final orders of removal issued by the BIA. While Congress has prohibited direct review of a BIA removal order, 8

---

1. The Immigration and Naturalization Service no longer exists as an independent agency within the Department of Justice. Its functions transferred to the newly formed Department of Homeland Security on March 1, 2003.

U.S.C. § 1252(a)(2)(C),[2] Courts of Appeal "possess limited 'jurisdiction to review factual determinations that trigger the jurisdiction-stripping provision'—specifically, (1) whether [petitioner] is an alien, and (2) whether [he] has been convicted of an aggravated felony." *Soliman v. Gonzales,* 419 F.3d 276, 280 (4th Cir.2005) (quoting *Ramtulla v. Ashcroft,* 301 F.3d 202, 203 (4th Cir.2002)). Since there is no dispute over petitioner Afeta's history of convictions, the only issue for review is whether petitioner became a United States citizen by virtue of his mother's naturalization in 1994.

As discussed in greater detail below, the BIA answered this question by applying the derivative citizenship provisions of 8 U.S.C. § 1432(a)(3) (1999) (repealed 2000), which apply when only one of two living parents becomes naturalized. The BIA interpreted the statute as requiring that the minor alien's parents have taken formal judicial steps to end their marriage at the time of naturalization. We must give this interpretation deference. Because section 1432(a)(3) "does not speak unambiguously to the precise question at issue, our inquiry under *Chevron* is simply to ask whether the [BIA]'s position 'is based on a permissible construction of the statute.'" *Asika v. Ashcroft,* 362 F.3d 264, 270 (4th Cir.2004) (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Courts of Appeal must apply *Chevron* principles of deference when confronted with questions about " 'an agency's construction of the statute which it administers.'" *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (quoting *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778.). "[W]e are bound by *Chevron* to defer to the [BIA]'s construction ... so long as it is reasonable." *Asika,* 362 F.3d at 270.

### III.

Before its repeal, Section 1432(a) specified certain situations that conveyed automatic citizenship on children born outside of the United States to alien parents. They are:

(1) The naturalization of both parents; or

(2) The naturalization of the surviving parent if one of the parents is deceased; or

(3) The naturalization of the parent having legal custody of the child when there has been a *legal separation* of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if

(4) Such naturalization takes place while such child is under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a) (1999) (repealed 2000) (emphasis added). Section 1432 does not define the term "legal separation."

In administrative hearings before the BIA, petitioner Afeta argued that 8 U.S.C. § 1432(a)(3) conveyed automatic citizenship upon him because his parents were

---

**2.** "[N]o court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense ...." 8 U.S.C. § 1252(a)(2)(C).

"legally separated" when his mother was naturalized in 1994. He relied then (and now) on a written Separation Agreement that first appeared in 2003.

This written Separation Agreement was incorporated into his parents' 2003 Maryland Judgment of Absolute Divorce. (J.A. 345–47). The Separation Agreement is dated December 7, 1987 and is signed by Bizunesh Shibeshi (petitioner's mother) and Merga Afeta (petitioner's father). The agreement provides that "[t]he parties mutually and voluntarily separated on December 7, 1987 with the intent and purpose of ending the marriage ... [and] to live separate and apart without cohabitation and in separate abodes." (J.A. 346). The written agreement states that upon separation, petitioner's father agreed to transfer his ownership interest in the house and provide petitioner's mother with sole legal custody of the children. In return, petitioner's mother agreed to refinance the home in her name only. The agreement was not notarized and does not reflect the presence of any witnesses. It was not filed with or adopted by any court prior to the parents' divorce in 2003.[3]

The BIA concluded that petitioner did not receive derivative citizenship upon his mother's naturalization in 1994 because only judicially recognized marital separations are considered "legal" for the purposes of section 1432(a). The BIA based its decision on its previous construction of the statute as well as the decisions of two Courts of Appeal. *See infra* pp. 406–07. Out of an abundance of caution, the BIA also reviewed Maryland law and concluded

that it did not suggest a contrary construction of the statute. Because the voluntary Separation Agreement produced by petitioner Afeta was not a formal judicial document, the BIA held that it did not constitute a "legal separation" as that term was used in 8 U.S.C. § 1432(a)(3).

## IV.

Petitioner contends that the BIA's interpretation of the statutory term "legal separation" is incorrect because Maryland law does not require a judicial order in order for a separation agreement to become "legal." Petitioner reasons that because Maryland courts will enforce voluntary separation agreements as a species of contract, the BIA must recognize his parents as "legally separated" as of the purported date of their agreement (*i.e.*, December 7, 1987).

■ Petitioner's reliance on Maryland law is misplaced. Congress did not incorporate state substantive law into section 1432(a)(3). When Congress chooses to make such an incorporation, its language is quite clear. For example, the federal government controls certain properties that lie within the boundaries of various states yet fall under the sole legal jurisdiction of the United States (*e.g.* military bases). In governance of these properties, Congress has clearly stated that:

> [w]hoever ... is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State ... in which such place is situated,

---

**3.** Respondent raises concern over the authenticity of the separation agreement and whether it actually existed in 1994 when petitioner Afeta's mother naturalized. Apparently, petitioner Afeta's mother was unaware that the agreement existed when she testified in 2002 that she had no recollection of such an agreement; however, she later discovered the agreement and incorporated it into the 2003 Maryland Judgment of Absolute Divorce. It is unnecessary to test the authenticity of the document or question its 1994 existence as it does not satisfy the "legal separation" requirement of 8 U.S.C. § 1432(a)(3).

... shall be guilty of a like offense and subject to a like punishment. 18 U.S.C. § 13(a). No such inclusive language appears in section 1432(a)(3). By contrast, section 1432(a)(3) merely speaks of "legal separation" without any reference to the state in which the alien resides.

■ The definition of the statutory term "legal separation" is well recognized in United States jurisprudence. *See Nehme*, 252 F.3d at 425–26 (performing review of states and territories that define or provide "legal separation" provisions that "contemplate a judicial decree"). With the exception of one easily distinguishable case discussed below, the BIA's decision in this case concurs with the Board's prior construction of section 1432(a)(3). *See Matter of H*, 3 I. & N. Dec. 742, 744 (B.I.A.1949) (defining "legal separation" as it applies to rules of naturalization to mean "either a limited or absolute divorce obtained through judicial proceedings").

The single BIA decision upon which petitioner relies is *Matter of Lenning*, 17 I. & N. Dec. 476 (B.I.A.1980). In that case, à wife petitioned for beneficiary immigrant status after separating from her husband. The petitioner entered a written separation agreement with her husband approximately one month before submitting her visa petition. The BIA construed the applicable statute to determine that Congress created section 201(b) of the Immigration and Nationality Act, 8 U.S.C. 1151(b), for the purpose of retaining family unity. The petitioner argued that the ALJ should have approved her visa petition because she was only separated, and her marriage was not yet "legally terminated." The BIA concluded that the statute's purpose would not be advanced when a petitioner enters a separation agreement to

live separate and apart from the citizen through whom she seeks to gain citizenship.

Petitioner Afeta argues that the BIA's holding in *Matter of Lenning* should be interpreted as a recognition that the separation agreement was evidence "legally sufficient" to establish "termination" of the immigrant's marital relationship. (Petr.'s Br. 14). We do not agree with such an interpretation. The BIA viewed the voluntary separation agreement as evidence sufficient to establish that the married couple had no intent to retain family unity. Thus, the legal effect of the separation agreement on the immigrant's marital status was irrelevant.

Additionally, the BIA's decision in *Matter of Lenning* is not binding in the instant case because the decision does not interpret section 1432. 17 I. & N. Dec. at 476. Even if we were to conclude that the BIA's current analysis is inconsistent with *Matter of Lenning*, it would only establish that the BIA's definition of "legal separation" changes depending on the statute in which the term is used.

Our sister circuits have adopted the BIA's interpretation of section 1432(a)(3). In *Nehme*, the Fifth Circuit held that "Congress clearly intended that the naturalization of only one parent would result in the automatic naturalization of an alien child *only* when there has been a formal, judicial alteration of the marital relationship." 252 F.3d at 425–26 (emphasis added).[4] Similarly, the Third Circuit has held that:

> [L]egal separation for purposes of § 1432(a) occurs *only* upon a formal governmental action, such as a decree issued by a court of competent jurisdic-

---

**4.** The *Nehme* Court performed a review of the states and determined that "state laws make it clear that in the United States, the term 'legal separation' is uniformly understood to mean judicial separation." 252 F.3d at 426.

tion that, under the laws of a state or nation having jurisdiction over the marriage, alters the marital relationship of the parties.

*Morgan v. Att'y Gen.*, 432 F.3d 226, 234 (3d Cir.2005) (emphasis added).

The Second Circuit construed section 1432(a)(3) with slightly broader but not inconsistent language in *Brissett v. Ashcroft*, 363 F.3d 130, 132 (2d Cir.2004). In that case, petitioner Brissett sought to avoid removal by establishing derivative citizenship through his mother's 1977 naturalization. Brissett claimed that his parents' marital sparring satisfied section 1432(a)(3)'s "legal separation" requirement because they lived separate and apart and he had lived solely with his mother since 1972. Petitioner Brissett bolstered his argument by pointing out that the Family Court for the State of New York ordered his father to pay child support in 1972. That Court also entered temporary protective orders in 1972 and 1974 that commanded petitioner's father not to assault, threaten, or harass his mother. *Id.* at 131–32. Without defining a threshold, the Second Circuit held that "a minimum more is required" to satisfy the "legal separation" requirement. *Id.* at 132. Then, the Court stated:

> § 1432(a)(3)'s requirement of a "legal separation" is satisfied *only* by a formal act which, under the laws of the state or nation having jurisdiction of the marriage, alters the marital relationship either by terminating the marriage (as by divorce), or by mandating or recognizing the separate existence of the marital parties.

*Brissett*, 363 F.3d at 132 (emphasis added).

The Tenth Circuit relied on *Nehme's* definition of "legal separation" to analyze

the term as used in the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161–68 ("COBRA"). That Act identifies "legal separation" as a "qualifying event" for health plan coverage. *Simpson v. T.D. Williamson Inc.*, 414 F.3d 1203, 1204 (10th Cir.2005). The Tenth Circuit held that:

> [A] divorce court's interlocutory protective order pending a divorce does not constitute a "legal separation" under [COBRA] § 1163(3).... [Instead,] [w]e conclude a "legal separation," and thus a "qualifying event," occurs within the meaning of COBRA ... *only* upon entry of a *final* court decree adjudicating the parties legal rights and obligations but preserving the marriage bond.

*Id.* at 1206 (first emphasis added).

## V.

Maryland law provides for only two types of judicially sanctioned marital dissolutions—an absolute divorce (*a vinculo*), Md.Code Ann., Fam. Law § 7–103 (2006), and a limited divorce (*a mensa et thoro*), Md.Code Ann., Fam. Law § 7–102 (2006). Each statute requires that the plaintiff satisfy certain grounds before the judicial decree will issue. For example, the grounds for a limited divorce are cruelty, excessively vicious conduct, desertion and certain voluntary separations. *See* Md. Code Ann., Fam. Law § 7–102 (2006).

 A limited divorce is tantamount to a separation; it "is practically nothing more than judicial permission to live separate and apart." *Thomas v. Thomas*, 451 A.2d 1215, 1222, 294 Md. 605, 618 (1982). While Maryland courts will enforce a private separation agreement as between the parties, that fact does not transform such an agreement into a limited divorce.[5]

---

**5.** Nothing in this opinion suggests that states do not have complete domain over marital

rights. The only thing at issue in this case is whether each state's definition of "legal sepa-

Only Maryland's General Assembly can specify the grounds upon which a married couple can receive judicial sanction to live separate and apart. *Stewart v. Stewart*, 66 A. 16, 17, 105 Md. 297, 300 (1907). The Maryland legislature has not enacted a statute delegating to married couples in Maryland the right to make up their own grounds for a limited divorce; decide between themselves that those grounds are satisfied; and then, in effect, write their own judicial order. The BIA therefore correctly concluded that Maryland law did not affect the application of § 1432(a)(3) to the facts of this case.

## VI.

Based on the above analysis, we conclude that the BIA's definition of "legal separation" is a reasonable interpretation of 8 U.S.C. § 1432(a)(3). It is impossible to conclude otherwise since no contrary law exists. Accordingly, we find that petitioner Afeta is an alien and that further review of the BIA's removal decision is beyond the jurisdiction of this Court.

*AFFIRMED*

SHEDD, Circuit Judge, concurring:

The "special deference rules" of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), apply to the Board of Immigration Appeals' ("BIA") interpretations of the Immigration and Nationality Act ("INA"). *Soliman v. Gonzales*, 419 F.3d 276, 281 (4th Cir.2005). Because we are reviewing the BIA's interpretation of the INA—specifically, its interpretation of the meaning of the term "legal separation" as used in 8 U.S.C. § 1432(a)(3)—*Chevron* requires us to conduct a two-step analysis.

We must first determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. However, if we determine that "Congress has not directly addressed the precise question at issue," we must determine whether the agency's interpretation "is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

I believe that a proper application of *Chevron* to this case requires us to proceed to the second step of the analysis. On this point, I agree that the BIA's interpretation of the term "legal separation" is a permissible construction of § 1432(a)(3). Accordingly, I concur in the denial of the petition for review.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

According to section 8–101(a) of the Maryland Family Code, "[a] husband and wife may make a valid and enforceable deed or agreement that relates to alimony, support, property rights, or personal rights." Moreover, a separation agreement between man and wife under Maryland law is a contract between the parties, subject to the same general rules governing other contracts. *Pumphrey v. Pumphrey*, 11 Md.App. 287, 273 A.2d 637, 639 (Md.Ct. Spec.App.1971).

In my opinion, Maryland courts would consider the written Separation Agreement in this case a federal "legal separation" under Maryland law.

ration" becomes binding on the BIA when applying 8 U.S.C. § 1432(a)(3). By giving the term "legal separation" a uniform federal construction, we do not purport to specify the

requirements for a valid separation under state law. The two are separate and distinct issues.

Other jurisdictions have held, *as we hold,* that a parent can legally bind himself by separation agreement to support a child after emancipation, and such an agreement will be enforceable as any other contract. *Pumphrey,* 273 A.2d at 640 (emphasis added).

I am thus of opinion Maryland state law should govern this matter of family law.