Garcia v. USICE (Dept. of Homeland Security)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: December 6, 2011    Decided: December 29, 2011)

Docket No. 09-4211-pr

CARLOS GARCIA,

*Petitioner-Appellant*,

-v.-

USICE (DEPT. OF HOMELAND SECURITY),

*Respondent-Appellee*.

Before:

MINER, WESLEY, and CHIN, *Circuit Judges*.

Appeal from judgment of the United States District Court for the Western District of New York (Telesca, *J.*). The district court denied Petitioner habeas corpus relief after finding that Petitioner did not derive citizenship from his father; the district court ruled that Petitioner was not in his father's "legal custody" when his father naturalized. We conclude that the district court erred because it relied on an unenforceable custody award.

"Legal custody" is a matter of federal law, which looks first to state law to determine whether there is an enforceable judicial determination or statutory grant of custody. If there is not, "actual uncontested custody" of the child controls. Here, there is a genuine factual dispute over which parent (if either) had "actual

uncontested custody" of Petitioner when his father naturalized.  Therefore, we **VACATE** and **REMAND** for a hearing under 8 U.S.C. § 1852(b)(5)(B).  In addition, we instruct the district court to appoint Petitioner *pro bono* counsel.

**VACATED** and **REMANDED**.

_____

TIMOTHY W. HOOVER (Peter C. Obersheimer, *on the brief*), Phillips Lytle LLP, Buffalo, NY, *for Petitioner-Appellant.*

KATHARINE E. CLARK, Trial Attorney, Office of Immigration Litigation, Civil Division (Tony West, Assistant Attorney General, Shelley R. Goad, Assistant Director, Russell J.E. Verby, Senior Litigation Counsel, *on the brief*), *for* Eric H. Holder, Jr., United States Attorney General, Washington, D.C., *for Respondent-Appellee.*

_____

WESLEY, *Circuit Judge*:

### I.

### A.

Carlos Garcia was born in the Dominican Republic on December 24, 1978.  His family immigrated to the United States in 1984, and shortly thereafter, he became a lawful permanent resident.  When Garcia's family arrived in the United States, they resided on West 107th Street in Manhattan.

In 1988, while his family was vacationing in the Dominican Republic, his mother divorced his father in a Dominican court.  The divorce decree purported to grant

Garcia's mother "guarda personal" ("personal guardianship").[1]  Following the vacation, Garcia's family returned to Manhattan and his parents continued living together on West 107th Street.  In 1989, the entire family moved to 201 West 109th Street, and in August 1994 (six years after the divorce), Garcia's mother finally moved into her own apartment.

On April 20, 1996, when Garcia was under the age of eighteen, his father naturalized.  Garcia alleges that at the time, he resided with his father and that his father had "actual uncontested custody" of him.

### B.

On January 27, 1998, the former Immigration and Naturalization Service ("INS") charged Garcia as removable under Immigration and Nationality Act ("INA") § 237(a)(2)(C) (conviction for a firearm offense).  INS took Garcia into custody until an immigration judge ultimately cancelled his removal.  *See Garcia v. U.S. Dep't of Homeland Sec.*, 657 F. Supp. 2d 403, 405 (W.D.N.Y. 2009).  Garcia, however, soon found himself back on the wrong side of the law.

---

[1]  The Dominican Divorce Law is unclear as to what is encompassed by the term "guarda personal."  The Divorce Decree includes no specific reference to custody.

3

As a result of several convictions in 2001 and 2002, the Government served Garcia with a Notice to Appear and ultimately ordered him removed to the Dominican Republic. Garcia applied for derivative citizenship based on his father's 1996 naturalization, but United States Citizenship and Immigration Services ("CIS") denied his application, finding that the Dominican Republic divorce decree granted Garcia's mother, and not his father, "legal custody." *Id.* at 406. After the CIS Administrative Appeals Office denied his appeal, Garcia filed a petition for a writ of habeas corpus in the district court.[2]

The district court denied Garcia's petition. It found the Dominican Republic divorce decree highly probative of which parent had custody (Garcia's mother) and therefore concluded that Garcia was unable to demonstrate that he was in his father's sole legal custody when his father

---

[2] On June 1, 2005, the district court transferred Garcia's citizenship petition to this court for consideration under the REAL ID Act. On September 28, 2006, this court remanded Garcia's case in a one-paragraph order and directed the district court to hold further proceedings "regarding petitioner's claim that he is a national of the United States." Order, *Garcia v. Dep't of Homeland Security*, No. 05-2818-ag (2d Cir. Sept. 26, 2006); *see also* 8 U.S.C. § 1252(b)(5)(B) (2006).

4

naturalized.[3] *Garcia*, 657 F. Supp. 2d at 407–08.

Throughout the initial proceedings, Garcia proceeded *pro se*. When the case came before us, we appointed Garcia *pro bono* counsel and asked for supplemental briefing.

**II.**

**A.**

Prior to its repeal, INA § 321 provided, in pertinent part:

> A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of the following conditions:
>
> . . .
>
> (3) The naturalization of the parent having *legal custody* of the child when there has been a legal separation of the parents . . .; and if
>
> (4) Such naturalization takes place while such child is under the age of eighteen years . . . .

INA § 321, 8 U.S.C. § 1432(a) (1996) (emphasis added), *repealed by* Child Citizenship Act Of 2000, Title I, § 103(a), 114 Stat. 1632.

The parties agree that when Garcia's father naturalized on April 20, 1996, (1) there was "a legal separation of the parents" and (2) Garcia was under the age of eighteen. The

---

[3] From the record, it appears that neither Garcia nor the Government ever questioned the enforceability of the divorce decree's purported custody award.

parties disagree as to whether Garcia was in the "legal custody" of his father at the time.

"Legal custody" is a matter of federal law.  *See Fierro v. Reno*, 217 F.3d 1, 4 (1st Cir. 2000).  Nevertheless, we often look to state law for a rule of decision "[w]here . . . there is no extant body of federal common law in the area of law implicated by the statute."  *Brissett v. Ashcroft*, 363 F.3d 130, 133 (2d Cir. 2004).  For example, in *Brissett*, we held that the term "legal separation" contained in the same subsection of the statute requires a formal act, as defined by state law, that alters the marital relationship.  *Brissett*, 363 F.3d 133-34.  In New York, the qualifying "formal act" is either divorce (termination of the marriage) or a *formal* written or judicial separation, which recognizes the separate existence of the marital parties.  *See id.*  We believe a similar reference to state law is appropriate, at least initially, for determining "legal custody,"  as "[l]egal relationships between parents and children are typically governed by state law, there being no federal law of domestic relations."  *Fierro*, 217 F.3d at 4 (internal quotation marks omitted).

The first step in deciding whether a naturalizing parent has "legal custody" of a child for purposes of derivative citizenship is to determine whether a judicial decree or statutory grant awards custody to the naturalizing parent. *Bagot v. Ashcroft*, 398 F.3d 252, 268-69 (3d Cir. 2005) (Rosenn & Nygaard, concurring). But, notwithstanding a formal termination of the marriage, what if there is no judicial or authorized determination of custody? In *Brissett*, we indicated that the absence of a formal judicial determination or written separation agreement was fatal to a derivative citizenship claim. *Brissett*, 363 F.3d at 134. Is an immigrant child of a naturalizing alien denied citizenship because there is no court order or *formalized* custody agreement? We think not; we are not convinced that our reasoning in *Brissett* equally applies to determinations of "legal custody."

In *Matter of M—*, 3 I. & N. Dec. 850 (BIA 1950), a child was born in Czechoslovakia to married parents; the mother was German and the father Jewish. In 1940, the mother "annulled" the marriage and father and daughter immigrated to the United States. They were lawfully admitted, and the father naturalized in 1947 when the child was under the age

7

of eighteen. *Id.* at 850–51. The "annulment," which the Board of Immigration Appeals ("BIA") treated as a divorce, made no provision for custody, but the mother had surrendered custody to the father. *Id.* at 851, 854.

The BIA held:

> [I]n the absence of judicial determination or judicial or statutory grant of custody in the case of legal separation of the parent of a person claiming citizenship under section 314(c) [INA § 321(a)'s predecessor], the parent having actual uncontested custody is to be regarded as having "legal custody" of the person concerned for the purpose of determining that person's status under section 314(c).

*Id.* at 856. We "accord substantial deference to the BIA's interpretations of the statutes and regulations that it administers." *Brissett*, 363 F.3d at 133. Moreover, *Matter of M—* has been the law for sixty-one years without congressional intervention.[4] The BIA's interpretation,

---

[4] Indeed, Congress specifically softened the custody requirement when it enacted the successor statute to former INA § 321:

> A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:
>
> (1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.
>
> (2) The child is under the age of eighteen years.
>
> (3) The child is residing in the United States in the legal and physical custody of the citizen parent

8

thus, has substantial persuasive weight. *See Zhang v. Holder*, 617 F.3d 650, 662 (2d Cir. 2010) (citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986)) (other citations omitted).

Decisions about the marital relationship tend to be final; custody decisions, in contrast, tend to be fluid and frequently change depending on the parents' situations and well-being. *See Bagot*, 398 F.3d at 270 (Rosenn & Nygaard, concurring). Parents' "agreement to transfer legal custody [is] within the purview of their authority and . . . it is not necessary for parents to come into court to change or amend a de[c]ree of divorce every time they . . . jointly make a major decision concerning the care and custody of their children." *Tabucbuc v. Ashcroft*, 84 F. App'x 966, 969 (9th Cir. 2004) (internal quotation marks omitted) (unpublished memorandum).

Requiring a formal act to change custody—something more than mere agreement—is counterintuitive to the attempts that parents make following a divorce to conduct their lives and those of their children with one goal: the children's best

---

pursuant to a lawful admission for permanent residence. 8 U.S.C. § 1431(a) (2006).

interest.  Moreover, in the absence of a judicial determination giving one parent sole custody of the child, each parent generally retains the rights and responsibilities that come with parenthood.  N.Y. Dom. Rel. Law § 81 (McKinney 2010); *see also* 45 N.Y. Jur. 2d Dom. Rel. § 333.

Our holding today is consistent with our decision in *Brissett*.  Divorce and judicial separation are inherently different from custody decisions.  *Bagot*, 398 F.3d at 267; *see also Morgan v. Att'y Gen.*, 432 F.3d 226, 234 (3d Cir. 2005) (recognizing after *Bagot* that in contrast to "legal custody," "legal separation" does require a "formal governmental action").  The BIA itself has recognized as much.  *Compare Brissett*, 363 F.3d at 133-34 (recognizing that the BIA interprets "legal separation" to require a formal act), *with Matter of M–*, 3 I. & N. Dec. at 856 (BIA's interpretation that "actual uncontested custody" can constitute "legal custody").

**B.**

In his supplemental brief, Garcia argues that New York would not recognize the Dominican Republic custody award and that if the Dominican custodial decree is unenforceable, the

10

parent with actual uncontested custody is the parent with "legal custody" for the purpose of evaluating his derivative citizenship claim.  We agree.

At the time that Garcia's mother secured the divorce, Garcia and his family resided in New York and had resided there for four years; New York was their "home state."  At that time, New York had enacted the Uniform Child Custody Jurisdiction Act ("UCCJA").[5]  Pursuant to the UCCJA, New York would not even *consider* recognizing a foreign custody award unless the foreign law substantially complied with the UCCJA.[6]  N.Y. Dom. Rel. Law § 75-n (McKinney 1987); N.Y. Dom. Rel. Law § 75-w (McKinney 1987).  As the New York Court of Appeals explained, the UCCJA required "[m]aximum rather than minimum contacts with the State."  *Vanneck v. Vanneck*, 49 N.Y.2d 602, 610 (1980).

---

[5]  The UCCJA limited the jurisdictional bases for making a custody determination.  N.Y. Dom. Rel. Law § 75-d (McKinney 1987).  New York replaced the UCCJA with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) on April 29, 2002.  We include the text of former § 75-d as an appendix to this opinion.

[6]  In contrast to the UCCJEA, which *mandates* recognition of a foreign custody award made in substantial accordance with the UCCJEA, *see* N.Y. Dom. Rel. Law § 75-d(1) (McKinney 2010), UCCJA merely encouraged recognition and enforcement of such awards, *see* N.Y. Dom. Rel. Law § 75-w (McKinney 1987).

It is quite clear that New York had jurisdiction to determine custody, not the Dominican Republic. New York was Garcia's home state when his mother secured the divorce; his family had lived in New York for four years prior to the divorce. Moreover, the record reflects that no other jurisdictional basis was present. Therefore, the Dominican Republic custodial award was not made in "substantial accordance" with the UCCJA. Garcia is correct; New York would not recognize the award.[7]

This case thus turns then on who had "actual uncontested custody" of Garcia when his father naturalized. Two predominant indicators of "actual uncontested custody" are (i) the child's physical residence, and (ii) consent to custody by the non-custodial parent. *See Bagot*, 398 F.3d at 267.

In the district court, Garcia, acting as his own counsel, presented largely uncontradicted evidence that he was in his father's "actual uncontested custody" when his

---

[7] Our conclusion that New York would not recognize the Dominican Republic custody award is also consistent with the United States' obligations under the Hague Convention. We are mindful that district courts must ensure that their determinations of "actual uncontested custody" involving a foreign person or custody determination comply with the Hague Convention. *See* 42 U.S.C. §§ 11601-11611.

father naturalized.  When Garcia's father became a citizen, he resided at 201 West 109th Street, Basement Apartment. The affidavits of Garcia and each of his parents provide unrebutted evidence that Garcia resided with both parents at that address from 1989 to at least August 1994.

A middle school abstract (procured by Garcia's *pro bono* counsel and submitted with this appeal) confirms that Garcia resided at 201 West 109th Street, Basement Apartment, during the 1993 school year.  The affidavits of Garcia and his mother each discuss her move out of the family residence in August 1994, leaving Garcia with his father at 201 West 109th Street, and that Garcia's father was "legally, financially, [and] physically responsible for him."  His parents contended that they had agreed that Garcia would remain with his father and not move out with his mother. The affidavits are further corroborated by a 2003 U.S. Alien Change of Address form completed by Garcia, which lists Garcia's "OLD address"—i.e., up until 2003—as his father's. Garcia alleges that this piece of evidence connects the dates between the school records from the 1990s through and past 1996 (when his father naturalized).

13

Before the district court, the Government pointed out that Garcia's father's 1988 and 1992 tax returns either listed Garcia as a dependent without providing his address, or indicated that he had no dependents.[8]  It also argued that in 1993, Garcia's father submitted an affidavit in support of his second wife's visa application that listed no dependents.[9]  In addition, Garcia's father's naturalization application omitted Garcia's address, an omission that the Government argues means that Garcia must have lived with his mother.[10]

In our view, there is a genuine dispute of material fact about which parent (if either) had uncontested custody of Garcia when his father naturalized.  The Government and

---

[8]  The Government did not place the 1992 tax return into the record and Garcia's appointed counsel suggests that the Government does not have a copy; the district court should ensure that the tax return is in the record if it chooses to rely on the tax return.

[9]  As with the 1992 tax return, the Government did not place the affidavit into the record and Garcia's appointed counsel suggests that the Government does not have a copy; if the district court relies on the affidavit, it must be part of the record.

[10]  We believe that the omission can equally be understood as a lack of adequate space on the naturalization form or minimal understanding of the English language.  The naturalization form had seven lines for children.  Garcia's father had eight children.  He listed Garcia on an additional page, which lacked the form blanks to enter Garcia's date of birth, country of birth, citizenship, alien number, and address.

14

district court relied almost entirely upon the Dominican Republic divorce decree to resolve the matter; without the divorce decree, the Government has introduced very little evidence to contradict Garcia's claim. It is the district court, however, that must weigh the probative value of Garcia's and the Government's evidence. 8 U.S.C. § 1252(b)(5)(B) (2006).

Garcia now has the benefit of appointed counsel, who has diligently searched for and found additional records—such as Garcia's school records—that shed further light on the issue of actual uncontested custody. Further, when acting *pro se*, Garcia was detained at the Batavia immigration detention center, which severely limited his ability to provide the court with documents and other evidence that might assist it in making its determination of which, if either, of Garcia's parents had actual uncontested custody of him when his father naturalized. Thus, we instruct the district court to hold a hearing under 8 U.S.C. § 1252(b)(5)(B) (2006).

The district court should conduct this hearing in the same manner that it conducts any other evidentiary hearing. The district court should give Garcia's appointed counsel

15

(and the Government) a fair opportunity to supplement the record, if necessary, with any additional evidence, including witness testimony, that is material to the custody issue.

### III.

We appoint Garcia counsel in the district court. We may appoint an unrepresented party counsel if we find the factors set forth in *Hodge v. Police Officers*, 802 F.2d 58 (2d Cir. 1986), satisfied. These factors include: (1) whether the party's claim has substantial merit; (2) whether the nature of the factual issues requires an investigation, and whether the party's ability to investigate is inhibited; (3) whether the claim's factual issues turn on credibility, which benefits from the skills of those trained in presentation of evidence and cross-examination; (4) the party's overall ability to present its case; and (5) whether the legal issues presented are complex. *Hodge*, 802 F.2d at 60-61. We find that all of these factors favor appointing Garcia counsel in the district court. Therefore, we instruct the district court to appoint Garcia counsel.[11]  28 U.S.C. § 1915(e) (2006);

---

[11]  We note that W.D.N.Y. Local Rule 83.1(f) requires members of the district court's bar to be available "upon the

*Hendricks v. Coughlin*, 114 F.3d 390, 393-94 (2d Cir. 1997);
*Hodge*, 802 F.2d at 60-61.

**IV.**

We have reviewed Garcia's other claims on appeal and find them to be without merit.  To conclude, we **VACATE** and **REMAND** the district court's order and judgment.  We instruct the district court to hold a hearing consistent with this opinion, and we appoint Garcia counsel for the district court proceedings.  We continue Garcia's stay of removal pending further proceedings in this court.

**VACATED** and **REMANDED**.

---

Court's request for appointment to represent or assist in the representation of indigent parties."  We take judicial notice that Garcia's appointed counsel before this court, Mr. Timothy W. Hoover, is a member of the Western District Bar.  We appreciate Mr. Hoover's outstanding representation before us.  We recommend that the district court ask Mr. Hoover to continue representation in the district court, and if he declines, appoint another attorney to represent Garcia *pro bono*.

**APPENDIX**

1.  A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree *only when*:

    a.  this state (i) is the home state of the child at the time of commencement of the custody proceeding, or (ii) had been this child's home state within six months before commencement of such proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as a parent continues to live in this state; or

    b.  it is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is within the jurisdiction of the court substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

    c.  the child is physically present in this state and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child; or

    d.  (i) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraph (a), (b), or (c), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

2.   Except under paragraphs (c) and (d) of subdivision one
     of this section, physical presence in this state of the
     child, or of the child and one of the contestants, is
     not alone sufficient to confer jurisdiction on a court
     of this state to make a child custody determination.

3.   Physical presence of the child, while desirable, is not
     a prerequisite for jurisdiction to determine his
     custody.

N.Y. Dom. Rel. Law § 75-d (McKinney 1987) (emphasis added).